*In re* DAWN H., a Minor, Respondent-Appellee (The People of the State of Illinois, Petitioner-Appellee, v. Robert H., Respondent-Appellant.)

First District (5th Division)    No. 1—92—2364

Opinion filed February 9, 1996.—Rehearing denied April 10, 1996.

Samuel J. Cahnman, of Chicago, and Gloria A. Morris, of Springfield, for appellant.

Patrick T. Murphy, Public Guardian, of Chicago (Lee Ann Lowder and Jane Burwell, of counsel), for appellees.

PRESIDING JUSTICE McNULTY delivered the opinion of the court:

Robert H. appeals from an order by the juvenile court finding him to be an unfit parent and terminating his parental rights in his daughter, Dawn H. We affirm.

Dawn H. was born to Kathy K. and Robert H. on October 31, 1984. Robert H. and Kathy K. were not married and at the time of Dawn's birth, Robert H. was serving time in prison. In 1985, the Illinois Department of Children and Family Services (DCFS) received a report that Kathy K.'s son Jimmy B., Dawn's half-brother, was being physically abused. A DCFS caseworker began assisting and providing

services to Kathy K. and her children and, on February 20, 1987, temporary custody was taken of Dawn and Jimmy and they were placed in foster care because Kathy K. had made no progress despite the services provided to her. Petitions for adjudication of wardship containing allegations of physical abuse and neglect of Dawn and Jimmy were filed on February 19, 1987. At trial on June 23, 1987, Kathy K. admitted the allegations of physical abuse and neglect. Robert H. defaulted as to the petitions, and the children were made wards of the court and remained in substitute care.

On February 20, 1991, the State filed supplemental petitions for appointment of a guardian with right to consent to adoption regarding Jimmy and Dawn. Because Kathy K. had signed voluntary surrenders of her parental rights to both Dawn and Jimmy, the trial on those petitions with respect to Dawn concerned only Robert H.'s fitness. The supplemental petition alleged that Robert H. is an unfit parent because he: (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to Dawn's welfare; (2) deserted Dawn for more than three months prior to the commencement of these proceedings for termination of parental rights; (3) failed to make reasonable efforts to correct the conditions that were the basis for removal of Dawn from her parent within 12 months after adjudication or failed to make reasonable progress toward the return of Dawn to such parent within 12 months after adjudication; (4) evidenced an intent to forego parental rights as manifested by a failure for a period of 12 months to visit Dawn, communicate with Dawn or the agency and/or to maintain contact with or plan for Dawn's future; and (5) is depraved.

Betty Jenkins testified at the hearing that she was the DCFS worker on the H. family case from 1985 until the spring of 1987. She stated that when she was first assigned to the case in September of 1985, Robert H. was not living with Dawn's mother. Jenkins' first contact with Robert H. occurred almost two years later, in February 1987, when he telephoned her at her request shortly after Dawn was taken into custody. They arranged to meet at Jenkins' office on February 25, 1987. During that meeting, Robert H. informed Jenkins that he was in fact Dawn's father, that he had been incarcerated at the time of Dawn's birth, and that after his release from prison in 1986, he began living in a condemned building as its caretaker. Robert H. told Jenkins that he had seen Dawn approximately a week and a half prior to his meeting with Jenkins. Robert H. told Jenkins that "he didn't really have that much of a relationship with [Dawn] because he had been incarcerated *** all of her life." He wanted Kathy K. to keep Dawn "but if there was any problem *** he would

try to take her." Jenkins testified that Robert H. admitted to her that he had a drug problem; however, she could not recall which drug he named.

Jenkins testified that Robert H. visited Dawn in her office in early March 1987, and that visit, which lasted over an hour, went well. Jenkins stated that when Robert H. called to arrange a second visit, she explained that Dawn was in Mt. Sinai Hospital and that he could visit her there. Jenkins could not recall whether Robert H. visited Dawn in the hospital.

Jenkins testified that she spoke to Kathy K. on March 30, 1987, and Kathy K. stated that she had no idea where Robert H. was. Jenkins explained that a few months later, in May of 1987, a private agency became the primary service provider for the H. family although she continued to be assigned to the case until July 1988, when she was promoted to supervisor. After her promotion, she continued to receive messages at her former telephone number, but never received one from Robert H. Jenkins testified that from March of 1987 to the time of trial, January 1992, she had no contact with nor message from Robert H.

Jenkins explained that it is not DCFS policy to include in family service plans parents who are missing or whose location is unknown. She testified that if Robert H. had been available, services would have been offered to him, but he was not available after March 1987.

Sandra McKoi, a caseworker with Bensenville Home Society, testified that Jenkins transferred the H. family case to her in June of 1987. McKoi worked as either the direct supervisor or supervisor of the case for approximately two years, until July of 1989. At the time the case was transferred to her, Jenkins informed McKoi that she did not know Robert H.'s whereabouts.

McKoi stated that she tried unsuccessfully to locate Robert H. through Kathy K. McKoi testified that as far as she knew, Robert H. never visited Dawn during the entire period McKoi was assigned to the case. She was never contacted by Robert H.

Cynthia Johnson, a social worker employed by Bensenville Home Society, testified that she was assigned to Dawn and Jimmy's case in July of 1989 and was still their caseworker at the time of trial. She stated that when she first spoke to Kathy K. in June 1990, she asked where Robert H. was, but received no information. In March 1991, she conducted a diligent search for Robert H., but was unable to locate him. She requested a "rap" sheet from the State's Attorney's office and completed a Department of Public Aid records check, which revealed an address for Robert H. She sent several certified letters to that address, but they were returned.

Johnson met Robert H. for the first time in May of 1991 when he appeared in court. She spoke with Robert H. briefly and she obtained an address from Robert's attorney where she could reach Robert H. after his release from prison. Johnson testified that Robert H. never came forward and never sent any cards or letters. She also stated that none of Robert H.'s relatives came forward to request that Dawn be placed with them and that she did not know his relatives.

Cameron Forbes, supervisor of the records office for the Illinois Department of Corrections at Joliet, Illinois, testified to the authenticity of the mittimus documents and certified copies of Robert H.'s convictions over the last 20 years. The convictions and sentences included: (1) a sentence of from 3 to 10 years for voluntary manslaughter and aggravated battery; (2) a sentence of from 6 to 18 years for armed robbery; (3) a sentence of four years for retail theft; (4) a sentence of three years for robbery; and (5) a sentence of 14 years for armed violence. Robert H. was serving the last sentence at the time of this trial.

Robert H. testified that Kathy K. telephoned him while he was in East Moline Correctional Center to tell him that she was pregnant. He acknowledged that he was the father of Dawn, born while he was still incarcerated.

Robert H. stated that he wrote to Kathy K. approximately four times a week while he was in prison. When he was released on January 6, 1986, he visited Dawn and Kathy K. and he visited them frequently in February 1986.

Robert H. testified that Kathy K. was living with her boyfriend and that made him "hot under the collar," but he nonetheless moved in with Kathy K. and her boyfriend. Dawn referred to her mother's boyfriend as "Daddy." Robert H. moved out after a few months because Kathy K. could not decide between the two men.

Robert H. testified that he found employment as a truck driver for a store and by chance encountered his 14-year-old son, G.R., who began living with him. Robert H. stated that he first learned that DCFS was involved with Dawn and Kathy K. in September 1986, when Jenkins visited Kathy K. while Robert H. was present. He later saw Jenkins in February 1987 and learned that Dawn was in DCFS' custody. He informed Jenkins that if there was any problem with Kathy K., he would try to take Dawn.

Robert H. testified that he met with Kathy K. in March of 1987, and Kathy K. informed him that she wanted her boyfriend's mother to have private guardianship of Dawn. Robert H. told Kathy K. that he "didn't care as long as he could visit."

Robert H. stated that he had no contact with DCFS from April to

August 1987, and no contact with Kathy K. after March 1987. He stated that in 1988 and 1989 he was working very hard. He lost track of Kathy K. and did not know where she or Dawn was living. Robert believed that Dawn might be living with Kathy K. and that was fine with him since he believed that, generally, "girls should be raised by their mothers and boys by their father[s]."

Robert H. testified that he remained in contact with DCFS regarding his son, G.R. Robert H. testified that from March 1990 to the present, he has been incarcerated except for a brief period after March 24, 1991. Robert H. acknowledged that he had told Jenkins that he had done drugs, but denied that he had a drug problem. Robert H. stated that he had no contact with Dawn from 1987 to 1990, and did not try to visit her or send her any letters, cards or gifts because he was busy with his son, G.R.

The trial court found that the State had proved beyond a reasonable doubt that Robert H. was unfit due to depravity, failure to show a reasonable degree of interest, desertion, failure to make reasonable efforts or progress toward D.H.'s return, and his intent to forego parental rights. The court found Robert H.'s failure to contact either Dawn or DCFS at any time after February 1987 to particularly evidence his lack of concern for Dawn. The court also noted that Robert H.'s extensive criminal record and long periods of incarceration established his depravity.

On June 15, 1992, the trial court heard evidence regarding placement options for Dawn and Jimmy. Johnson, the caseworker from Bensenville Home Society, testified that Kathy K. had signed surrenders of her parental rights to both Jimmy and Dawn on June 10, 1990. She testified that both children had been placed in the same foster home on July 7, 1990, and that, as of the date of the hearing, had bonded with their foster father and called him "Dad" or "Daddy."

Johnson testified that the foster father loves Dawn and provides her with all her family needs, including individual and family therapy. She stated that Dawn is strongly attached to her foster father and wishes to be adopted by him. Johnson stated her belief that the foster family was a bonded, family situation, and that it was in Dawn's best interests to be adopted by her foster father.

Robert H. presented no testimony at this hearing, but his attorney stated in closing argument that Robert H. realizes the possibility of his having his daughter with him again is pretty remote because he will be incarcerated. Therefore, all Robert H. wishes is that he be allowed to talk with his daughter, visit her occasionally, and know where she is and how she is growing up. Robert H.'s attorney stated that it is "very good" to have Dawn placed with the fos-

ter family since it is in Dawn's best interest to be with a stable family.

The court found that Dawn's foster father had invested his time, emotion, support and love in Dawn and her brother and it was in the children's best interests to have the stable environment the foster father provided and to be adopted by the foster father. Therefore, the guardianship administrator was appointed guardian with right to consent to adoption of Dawn and her brother.

Robert H. appealed and asked that certain dates of the hearing be transcribed. More than two years after he filed his notice of appeal, Robert H.'s attorney informed the juvenile court that one of the requested transcripts, for the date April 30, 1992, containing the testimony of Robert H. and Cynthia Johnson, was unavailable. The official court reporter submitted an affidavit to the juvenile court stating that she was the court reporter for the April 30, 1992, hearing and that after a diligent search was unable to locate her stenographic notes of that hearing. Robert H.'s attorney prepared a proposed bystander's report in lieu of a verbatim transcript of that date, pursuant to Supreme Court Rule 323(c). (155 Ill. 2d R. 323(c).) Dawn, through her attorney and guardian *ad litem*, Patrick Murphy, and the State disputed the accuracy of Robert H.'s proposed report and submitted a joint alternative report. Counsel for Robert H. proposed amendments to his initial report, but no agreement could be reached. After holding a hearing on the matter, the juvenile court determined that pursuant to Supreme Court Rule 323(c), the court would draft and certify a bystander's report. The court stated:

> "Let the record reflect I reviewed my notes in coming to this report as well as the notes of the motion and the stipulated testimony of both sides, both the agreed matters and the matters in dispute, I relied on my notes in making a decision as best as my independent recollection of the testimony. I don't believe anything further needs to be done at this time."

Robert H. claims on appeal that the loss of the court reporter's notes, the inability of the bystanders to agree as to the contents of the testimony and the fact that Robert's H.'s proposed report differs "in a number of crucial aspects" with the certified report requires that this case be reversed and remanded for a new trial. Robert H. also alleges on appeal that his incarceration was insufficient to establish desertion, disinterest, or depravity and the trial court erred in relying on it as a basis for finding him to be an unfit parent.

■ Illinois Supreme Court Rule 323(c) provides:

> "Procedure If No Verbatim Transcript Is Available (Bystander's Report). If no verbatim transcript of the evidence of proceedings is

obtainable the appellant may prepare a proposed report of proceedings from the best available sources, including recollection. The proposed report shall be served on all parties within 28 days after the notice of appeal is filed. Within 14 days after service of the proposed report of proceedings, any other party may serve proposed amendments or an alternative proposed report of proceedings. Within 7 days thereafter, the appellant shall, upon notice, present the proposed report or reports and any proposed amendments to the trial court for settlement and approval. The court, holding hearings if necessary, shall promptly settle, certify, and order filed an accurate report of proceedings. Absent stipulation, only the report of proceedings so certified shall be included in the record on appeal." 155 Ill. 2d R. 323(c).

Robert H. cites *People v. Seals* (1973), 14 Ill. App. 3d 413, 302 N.E.2d 701, for the proposition that where a trial judge files a report of proceeding under Rule 323(c) that conflicts with the proposed bystander's report, the record may be insufficient to permit an effective appeal. In *Seals*, the State's Attorney was ordered to prepare a bystander's report since no trial transcript was available. The State's Attorney failed to comply with this order and the trial judge himself filed a synopsis of the proceedings. Defendant filed a statement of proceedings that conflicted with that of the trial judge. The defendant's conviction was reversed and remanded for a new trial on the basis that defendant's grounds for appeal made out a "colorable need" for a verbatim transcript and the State had the burden of showing that an alternative to the transcript would suffice for an effective appeal. (*Seals*, 14 Ill. App. 3d at 414.) The requirements of Rule 323(c) were not complied with and the brief summary of proceedings provided by the trial judge contained conclusory language and insufficient detail for appellate review.

Here, in contrast to *Seals*, each party complied with the procedures of Rule 323(c) by preparing a proposed report of proceedings. The juvenile court judge found each report inadequate in some respect and therefore prepared and certified his own report of proceedings based on Robert H.'s proposed bystander's report, the joint alternative report of proceedings submitted by the State and the public guardian, additional stipulated testimony as to the accuracy of the alternative report, and the court's own recollection and notes from the date of the missing court proceedings. The fact that the parties did not agree as to the contents of the report of the proceedings is not determinative. Rule 323(c) recognizes that disputes may arise as to the contents of a report and therefore provides procedures to be followed in arriving at a certified report under such

754

circumstances. The juvenile court in this case fully complied with the requirements of Rule 323(c) in preparing the certified bystander's report. The judge's report was not a brief, conclusory summary as was prepared in *Seals,* but was a five-page bystander's report detailing the trial testimony. The certified report here presents us with no difficulty in reviewing alleged trial errors.

■ We are not persuaded by Robert H.'s claims that he presented a colorable need for a verbatim transcript and that the certified bystander's report differs in "a number of crucial aspects" regarding the testimony of Robert H. Robert H. cites *People v. Stark* (1966), 33 Ill. 2d 616, 213 N.E.2d 503, for the proposition that a new trial is required when crucial testimony is unavailable due to the loss of the court reporter's notes. In that case, unlike here, no attempt was made to replace the missing transcript by utilizing the provisions of Rule 323(c). Furthermore, in *Stark* the missing evidence was essential to a review of whether defendant's confession was admissible.

■ In the instant case, the public guardian claims that according to Rule 323(c), absent stipulation, only the certified report may be made part of the record on appeal. The public guardian urges us to impose upon Robert H. some sanction for including his proposed bystander's report in the record on appeal and suggests as one such sanction striking Robert H.'s proposed report from the record. The public guardian has presented us with no case law addressing the lack of reviewability of a Rule 323(c) determination. Assuming, without deciding, that we may consider Robert H.'s proposed report, we do not hesitate to conclude that based on the particular facts of this case, the trial court's decision would have been no different even if Robert H.'s proposed report had been the one certified. The testimony provided in Robert H.'s proposed bystander's report, but not in the certified report, was not crucial to the determination of whether Robert H. was an unfit father. Robert H. does not assert that the certified bystander's report contradicted his proposed report. Robert H. instead claims that the certified report failed to include his testimony that in April 1986, he visited Dawn on weekends and gave Kathy K. $50 "every week or so." As discussed more fully below, the juvenile court had ample evidence from which to conclude that Robert H. was an unfit parent and Robert H.'s proposed report does not contain any crucial information demonstrating to us that the juvenile court judge's decision was erroneous. See *People v. Mays* (1982), 91 Ill. 2d 251, 437 N.E.2d 633 (although neither defendant's proposed bystander's report nor any other report was certified, defendant was not entitled to reversal since the bystander's report he submitted and was prepared to use on appeal failed to show any error had been

committed); *People v. Armstrong* (1976), 43 Ill. App. 3d 586, 357 N.E.2d 84 (court found no reversible error since the trial court had utilized the procedures under Rule 323(c) in an exemplary manner with the assistance of trial counsel for both sides, the certified report was based on notes made by the trial attorneys for both parties and the trial court, and defendant's claim of prejudice was pure speculation).

Robert H. alleges that the juvenile court's finding that he was an unfit parent was against the manifest weight of the evidence since the juvenile court improperly relied on Robert H.'s incarceration as grounds constituting desertion, disinterest, and depravity. Robert H. alleges that his proposed bystander's report indicates that the juvenile court focused on Robert H.'s criminal record in determining that Robert H. was an unfit parent and, according to Robert H., such a focus was improper since he had extensive contact with his daughter while he was not incarcerated and his only reason for not maintaining contact while imprisoned was his inability to discover his daughter's whereabouts.

Parental rights are of deep human importance and must not be lightly terminated. (*In re Paul* (1984), 101 Ill. 2d 345, 461 N.E.2d 983.) A court may terminate parental rights and appoint a guardian with the power to consent to adoption if the court finds, based on clear and convincing evidence, that the parent is unfit. (*In re Jason U.* (1991), 214 Ill. App. 3d 545, 574 N.E.2d 90.) The decision to terminate parental rights and appoint a guardian rests within the sound discretion of the trial court, and a reviewing court should not interfere with the trial court's decision absent an abuse of discretion. (*Jason*, 214 Ill. App. 3d at 550.) That discretion was not abused here.

Parental rights may be terminated if the parent is adjudicated unfit for one or more of the grounds listed in the Adoption Act (Act) (750 ILCS 50/1(D) (West 1994)). The Act provides:

"D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following:
  \*\*\*
  (b) Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare.
  (c) Desertion of the child for more than 3 months next preceding the commencement of the Adoption proceeding.
  \* \* \*
  (i) Depravity.
  \* \* \*
  (m) Failure by a parent to make reasonable efforts to cor-

rect the conditions that were the basis for the removal of the child from the parent, or to make reasonable progress toward the return of the child to the parent within 12 months after an adjudication of neglected minor, abused minor or dependent minor under the Juvenile Court Act or the Juvenile Court Act of 1987." 750 ILCS 50/1(D)(b), (D)(c), (D)(i), (D)(m) (West 1994).

■ The juvenile court here found Robert H. to be an unfit parent based on "depravity, failure to show a reasonable degree of interest, desertion, failure to make reasonable efforts/progress towards return, and evidenced intent to forego parental rights." The findings of unfitness were not based solely on Robert H.'s incarceration, but were supported by an array of other evidence, particularly Robert H.'s lack of contact and interest in D.H. for the five years prior to trial.

Even Robert H.'s own version of the missing proceedings supports the juvenile court's findings. Robert H.'s proposed bystander's report states:

"The court commented that Mr. H. would have sought out D.C.F.S. if he really cared. *** [T]he father's excuse for not visiting his daughter within twelve months was a poor excuse; Mr. H.['s] incarceration showed poor parenting. Mr. H. deserted his daughter, did not care about her, and did not call D.C.F.S. to find out what had happened to his daughter. Further, the court found depravity based upon Mr. H's criminal record. Therefore, the Court revoked Mr. H.'s parental rights."

Thus, even Robert H. admits that it was not just his criminal activity and repeated incarceration that resulted in the trial court's determination that he was an unfit parent, but also the fact that he had no contact with his daughter, he did not care what happened to his daughter, he deserted his daughter and he did not call DCFS to find out what happened to his daughter.

Robert H.'s lack of interest in Dawn is apparent from the fact that from March 1987 to April 1992, Robert H. made no efforts to contact his daughter, to gain information about her welfare or to work toward her return. All of the social workers assigned to Dawn's case testified that they could not locate Robert H. and Robert H. did not contact them or their agencies. Robert H.'s proposed bystander's report does not show us otherwise. Robert H. claims that he had failed to maintain contact with Dawn while he was out of prison because he was busy taking care of his son. Robert H. does not deny that he had no contact with his daughter after 1987 and made no effort to contact her or to contact DCFS to see if it knew of his daughter's whereabouts.

Robert H. stated that he thought Kathy K. should raise Dawn because girls should be raised by their mothers. Despite the fact that

he knew Kathy K. was not properly taking care of her, Robert H. made no efforts to have Dawn live with him while he was out of prison, stating only that he would "try" to take her if necessary. However, when Kathy K. told him that she wanted her boyfriend's mother to have private guardianship, Robert H. said "he didn't care as long as he could visit." After learning that Dawn was no longer living with Kathy K., Robert H. made no effort to see that Dawn returned home. The fact that Robert H. was Dawn's noncustodial parent does not relieve him of the responsibility of making reasonable efforts to correct the conditions that led to Dawn's removal from her home. *Jason*, 214 Ill. App. 3d at 551.

Desertion connotes conduct indicating an intention to permanently terminate custody over a child while not relinquishing all parental rights. (*In re R.B.W.* (1989), 192 Ill. App. 3d 477, 548 N.E.2d 1005.) Evidence of intent to forego parental rights is manifested by failure for a period of 12 months to visit the child, to communicate with the child or agency, although not prevented by the agency or court order from doing so, or to maintain contact with or plan for the child's future, although physically not unable to do so. (750 ILCS 50/1(D)(l), (D)(n) (West 1994).) Robert's attorney made it clear in his closing argument that Robert H. never intended to undertake full parental responsibilities for Dawn, he just wanted to visit her occasionally. However, the fact that Robert H. did not visit Dawn for almost five years or attempt to discover her whereabouts during that time supports the trial court's finding of desertion, an intent to forgo parental rights, lack of interest in Dawn H. and failure to work towards her return. Even assuming, as Robert H.'s proposed bystander's report states, that Robert H. did visit Dawn every weekend in April 1986 and gave Kathy K. $50 every week or so, the fact remains that Robert H. demonstrated a lack of interest in Dawn throughout most of her life. Thus, the juvenile court had sufficient basis for finding Robert H. an unfit parent on grounds other than depravity due to his incarcerations.

■■ Regardless of this other evidence demonstrating unfitness, the trial court also was entitled to consider Robert H.'s incarcerations in finding depravity. Depravity of a parent may be shown by a series of acts or a course of conduct that indicates a moral deficiency and an inability to conform to accepted morality. (*In re B.C.* (1993), 247 Ill. App. 3d 803, 617 N.E.2d 1207.) Although a single felony conviction is not sufficient in and of itself to establish the depravity of a parent, a number of convictions can be sufficient since they can establish a pattern of criminal activity. (*B.C.*, 247 Ill. App. 3d at 805.) Robert H. relies on *In re Sanders* (1979), 77 Ill. App. 3d 78, 395 N.E.2d

1228, in support of his argument that a parent's incarceration cannot be the sole basis for a finding of depravity, abandonment or desertion. In *Sanders*, the court noted that a criminal record is not conclusive on the issue of depravity, and there must be some allowance for an individual to be rehabilitated. In this case, a stipulation was entered that stated that over a 20-year period, Robert H. had been convicted five times for a series of crimes, all but one of which were violent: voluntary manslaughter, aggravated battery, armed robbery, retail theft, robbery and armed violence. Robert H. had an opportunity to show that he was rehabilitated while released from prison, yet he continued committing felonies and being sent back to prison. This pattern of conduct shows depravity, without potential for rehabilitation.

We therefore conclude that while Robert H.'s proposed report contains some testimony not included in the certified report, the trial court properly complied with Rule 323(c) in preparing the certified report and Robert has failed to show us how he was prejudiced by the use of the certified report rather than his proposed report or a verbatim transcript. Our review of the record shows no abuse of the juvenile court's discretion in finding Robert H. to be an unfit parent and that it was in Dawn's best interest to be adopted by her foster father. We also conclude that based on the facts and circumstances of this case and the absence of authority showing that a trial court's certification of a Rule 323(c) report is unreviewable, the public guardian's request for sanctions is denied.

Affirmed.

GORDON and HOURIHANE, JJ., concur.