*In re* SHELTANYA S., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Michael Brent, Respondent-Appellant (Sheltanya S., Minor Respondent-Appellee)).

First District (5th Division)    No. 1—98—4504

Opinion filed December 17, 1999.

Todd C. Berg, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Nancy Grauer Kisicki, and Shawn M. Concannon, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Public Guardian, of Chicago (Ron Fritsch, Assistant Public Guardian, of counsel), for Sheltanya S.

JUSTICE QUINN delivered the opinion of the court:

Respondent-appellant, Michael Brent (respondent), appeals from both the circuit court's findings of parental unfitness and its order

terminating respondent's parental rights and appointing a guardian with authority to consent to the minor's adoption. Based on the following factual findings and reasons, we affirm the circuit court's findings and order.

On December 5, 1991, a petition for adjudication of wardship was filed on behalf of Sheltanya S. (Sheltanya), who was born on January 22, 1986. The petition alleged that Sheltanya was neglected due to an injurious environment and that she was abused. Earlier that month, Sheltanya's mother, Lillie S., severely burned Sheltanya's hand. A finding of abuse was entered on August 5, 1992. After a dispositional hearing, the juvenile court found that Sheltanya's mother and father (respondent) were unfit. On March 3, 1994, the juvenile court ordered that a Department of Children and Family Services (DCFS) administrator be appointed as guardian of Sheltanya with the right to place her. Sheltanya was placed with her maternal great-grandmother.

On September 27, 1996, the State filed a petition for appointment of a guardian with the right to consent to adoption. The petition alleged that both respondent and Sheltanya's mother, Lillie, were unfit pursuant to section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 1994)) and section 2—29 of the Juvenile Court Act of 1987 (705 ILCS 405/2—29 (West 1994)), based on the following grounds: (1) they abandoned Sheltanya; (2) they failed to maintain a reasonable degree of interest, responsibility or concern as to Sheltanya's welfare; (3) they deserted Sheltanya for more than three months preceding the commencement of termination proceedings; (4) they failed to demonstrate a reasonable degree of interest, responsibility or concern as to Sheltanya's welfare during the first 30 days after her birth; (5) they failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child, and/or they failed to make reasonable progress toward the return of Sheltanya within 12 months after the adjudication of neglect and abuse; and (6) they evidenced an intent to forego their parental rights. 750 ILCS 50/1(D)(a), (D)(b), (D)(c), (D)(l), (D)(m), (D)(n) (West 1998); 705 ILCS 405/2—29 (West 1994). Several other grounds for unfitness were alleged with respect to Lillie. The petition alleged that it was in the best interest of Sheltanya that a guardian be appointed with the right to consent to her adoption.

The State filed an amended supplemental petition on February 6, 1998, alleging that respondent and Lillie S. were unfit on the additional ground that they behaved in a depraved manner in violation of section 1(D)(i) of the Adoption Act (750 ILCS 50/1 (D)(i) (West 1994)), and section 2—29 of the Juvenile Court Act (705 ILCS 2—29 (West 1994)), based on their history of criminal convictions. Respondent's criminal history included the following: (1) a charge of burglary

(720 ILCS 5/19—1 (West 1994)), to which he pled guilty and of which he was convicted on August 30, 1984, and for which he was sentenced to two years' probation; (2) a charge of unlawful use or possession of a weapon after having been convicted of the above burglary (720 ILCS 5/24—1.1 (West 1994)), to which respondent pled guilty and of which he was convicted on February 7, 1989, and for which he was sentenced to five years' imprisonment; (3) a charge of robbery (720 ILCS 5/18—1 (West 1994)) to which respondent pled guilty and for which he was sentenced to three years' imprisonment on November 30, 1992; (4) a charge of possession of a controlled substance (720 ILCS 570/402(c) (West 1994)), to which respondent pled guilty and of which he was convicted on January 26, 1994, and for which he was sentenced to two years' imprisonment; (5) a charge of robbery (720 ILCS 5/18—1 (West 1994)), to which respondent pled guilty and of which he was convicted on December 6, 1995, and for which he was sentenced to three years' imprisonment; (6) a charge for the manufacture and delivery of cannabis (720 ILCS 550/5(d) (West 1994)), to which respondent pled guilty and of which he was convicted on December 6, 1995, and for which he was sentenced to three years' imprisonment; and (7) a charge for possession of a controlled substance (720 ILCS 570/402(c) (West 1994)), to which respondent pled guilty and of which he was convicted on December 19, 1995, and for which he was sentenced to one year of imprisonment.

The fitness hearing took place from May 26, 1998, to September 1, 1998. Respondent testified that he was incarcerated for possession of cannabis when Sheltanya was born in January of 1986. Respondent lived with his father and Lillie S. from the time Sheltanya was about one month old until she was about two years old. Lillie then left respondent, taking Sheltanya with her, and moved to a new location.

Respondent testified that he was not imprisoned from July 5, 1991, to November 30, 1992, but he did not know Sheltanya's whereabouts. Respondent testified that he went to visit Sheltanya at the house where she was staying, and he saw that she had a burn on her arm. Respondent testified that he then took Sheltanya to his mother's house and that his mother bandaged her wound. Respondent did not call the police or take Sheltanya to the hospital. Respondent took Sheltanya back to Lillie's house. Respondent went back to Lillie's house the day after he returned Sheltanya, but Lillie and Sheltanya were gone. They had not told him where they were going, and respondent did not have a telephone number where he could reach Sheltanya. Respondent testified that he did not know anyone who knew of Sheltanya's whereabouts. Respondent did not call the police or DCFS.

Respondent testified that he was incarcerated again on November

30, 1992. Respondent was released on August 19, 1993. While incarcerated, respondent did not try to contact the police or anyone else to determine Sheltanya's whereabouts. Respondent testified that when he was released he went back to the house where Lillie used to live, but no one was there.

On January 26, 1994, respondent was convicted for possession of a controlled substance and was sentenced to one year of imprisonment. Respondent was paroled on July 8, 1994. Respondent was convicted of robbery on December 6, 1995, and was released on April 2, 1998. Respondent testified that he did not attempt to locate Sheltanya during the 17 months between the two convictions.

Respondent testified that he called Alan Busch from DCFS several times after his release from prison in 1998, but he did not reach anyone and did not leave a message. Respondent could not recall the dates he made the calls. Respondent testified that he did not send Busch a letter informing him of his release from prison or providing an address where respondent could be reached.

Lillie S. also testified at the fitness hearing. Lillie testified that respondent did not give her child support but "came around" when she lived with respondent and his father. Lillie testified that respondent's father, and not respondent, took care of Sheltanya. Lillie testified that when she moved out of respondent's home, respondent knew where she went and saw Sheltanya as many times as he wanted to. Lillie testified that she never tried to conceal Sheltanya's whereabouts from respondent. Lillie testified that respondent knew the address of Lillie's mother and that Lillie's family always knew of her whereabouts.

Lillie also testified that from the time she left respondent, when Sheltanya was two years old, until DCFS removed Sheltanya, when she was five years old, respondent saw Sheltanya "a lot." Lillie testified that Busch asked her about respondent's whereabouts, but Lillie stated that she did not know. Respondent lived about four blocks from her, but Lillie did not know on which street. Sheltanya went to Lillie's mother's house to visit. Respondent also went to Lillie's mother's house. Lillie testified that while she was incarcerated at Cook County jail, she and respondent had a court date on the same day and rode the bus from the jail together to court. Lillie told respondent that Sheltanya was placed in Lillie's grandmother's custody.

Darryl Applewhite, who was a case manager for Catholic Charities, testified that he was assigned to Sheltanya's case in October of 1993. Applewhite did not know respondent's whereabouts and thus conducted a search. From June 15, 1994, until January of 1995, the search included a public aid search and a telephone directory search. Applewhite testified that at the time he conducted the search, it was

not proper practice to contact the Department of Corrections to determine if someone was incarcerated.

A second six-month service plan was created in December of 1994. During this time, Applewhite still did not know respondent's whereabouts and did not perform any further searches. Rather, Applewhite inquired of Sheltanya's foster mother, Sheltanya's maternal great-grandmother, if she knew respondent's whereabouts, but she did not. Applewhite made monthly visits to see Sheltanya. Each time he inquired if respondent had any contact with Sheltanya's foster mother.

Martie Gumm, a DCFS case monitor, testified that he was assigned to the case from May of 1994 to February of 1996. Gumm testified that he reviewed the case file, and it was indicated that respondent's whereabouts were unknown. He performed a search in conjunction with Catholic Charities, which included a public aid screen, a telephone directory search, and following up on respondent's last known address.

Allen Busch, a caseworker for Catholic Charities, was assigned to Sheltanya's case in February of 1995. During the first service plan, Busch did not know respondent's whereabouts. Then Busch performed a public aid screen and a telephone book search. In February of 1996, Busch sent out a letter to all Michael Brents listed in the public aid screen and telephone book.

Several weeks later, Busch received a letter from respondent dated February 28, 1996, stating that he was the father of Sheltanya and that he was incarcerated. In the letter, respondent stated that he would not give up any rights to his daughter, except to his new girlfriend. Respondent asked that Sheltanya remain in foster care until he was released from prison in 1998. Busch then prepared a service plan for respondent and task sheets, which he sent to respondent in prison.

Busch testified that, while respondent was incarcerated, he sent service plans to at least three separate facilities. Busch did not receive any requests for visitation with Sheltanya from respondent until respondent was released from prison. Busch did not receive any cards, letters or gifts from respondent for Sheltanya. Respondent did not contact Busch to tell him that he had problems with the services in prison or to inquire what he needed to do to get Sheltanya back.

On cross-examination, Busch testified that he never sent any documentation to respondent in prison offering to set up visitation or informing respondent that he would take cards, gifts, or letters to Sheltanya. Busch did not give respondent Sheltanya's address or telephone number because he wanted to ensure that there would be no problems while Sheltanya was at her foster home. Busch testified

that he did not tell respondent how to accomplish the tasks on the task sheets that were sent to him, nor did he check with the prison officials to make sure that the services on the task sheet were available. However, respondent did not ever contact Busch to inform him that he needed help. Busch testified that when he sent respondent the task sheet for December of 1996, he contacted a counselor at the facility where respondent was housed, but he could not recall the counselor's name. Busch further testified that he received a telephone call from a counselor at the Big Muddy correctional facility and learned that parenting classes were offered there, but Busch could not recall if psychological, drug, and alcohol evaluations were offered there.

Respondent was released from prison on April 23, 1998. Busch testified that it was respondent's obligation to tell Busch of his release date. Respondent did not do so and did not provide Busch an address where he could be located. After Busch discovered that respondent had been released, he contacted respondent's attorney. Respondent made two requests for visits with Sheltanya, one after Busch contacted him and one a week prior to the court hearing. Respondent did not request any other services from Busch.

Respondent testified in his own behalf at the hearing. After Sheltanya was born, he lived with Sheltanya and Lillie for eight months to a year. After respondent and Lillie broke up, respondent lived with his father, about four blocks from Sheltanya and Lillie. Respondent testified that he visited Sheltanya about twice a week for about a year or two. Sheltanya also visited with respondent's relatives. Respondent was then incarcerated in July of 1990 at the Shawnee Correctional Center for approximately one year. When respondent was released, he moved in with his mother about six or seven blocks from where Lillie and Sheltanya resided. Respondent again visited Sheltanya, beginning a week after he was released in July of 1991, about twice a week for two to three months. After that, respondent would visit, but not often.

On cross-examination, respondent testified that the last time he had contact with Sheltanya was in December of 1991, when Sheltanya's hand was burned. Respondent testified that in February of 1996, he wrote that he would not give up his parental rights but that he had no immediate responsible family member, and he asked that Sheltanya be kept in foster care until he was released from prison.

In October 1996, respondent was transferred to Big Muddy Correctional Center, where respondent was incarcerated for about 10 months. Respondent did not take parenting classes or have a psychological evaluation while at Big Muddy because, respondent testified, these were not available. Respondent also testified that he did not have a drug or alcohol evaluation while at Big Muddy because

there was a waiting list, "and there was all this red tape." When questioned why he did not write to Busch and tell him he could not get into any services, respondent replied, "I couldn't answer that. I wouldn't know."

From approximately October 1996 until February 1997, respondent was incarcerated at the Vienna correctional facility. Respondent testified that he received another release form but did not sign it; rather, he kept it. Respondent also testified that he did not take parenting classes or receive a psychological evaluation because he thought they were not offered. Respondent further testified that he was put on a waiting list for a drug and alcohol assessment.

Respondent testified that after he was released from prison he telephoned Busch twice, but both calls were answered by an answering machine, and respondent did not leave messages. The third time respondent telephoned Busch, he left his telephone number. Respondent testified that Busch called respondent back five or six days later and stated that he would set up a visit with respondent and Sheltanya, but this visit never occurred.

On September 1, 1998, the final day of the hearing, the court entered an order finding that Sheltanya was abused, finding that Lillie S. and respondent were unfit parents. The court found that the State did not prove by clear and convincing evidence that respondent abandoned his daughter, but it made the following findings: respondent failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of Sheltanya; respondent deserted Sheltanya for more than three months next preceding the termination proceeding; respondent failed to demonstrate a reasonable degree of interest, concern or responsibility as to Sheltanya's welfare during the first 30 days after her birth; respondent failed to make reasonable efforts to correct the conditions that were the basis for the removal of Sheltanya within 12 months of the adjudication of abuse; respondent failed to make reasonable progress toward the return of Sheltanya to respondent within 12 months of the adjudication of abuse; respondent evidenced an intent to forego his parental rights; and respondent's prior instances of incarceration have prevented or will prevent him from discharging his parental responsibilities. The court specifically found that, based on respondent's seven felony convictions and the evidence presented at the hearing, respondent possessed an inherent deficiency of moral sense and rectitude with respect to Sheltanya.

Proceedings were then commenced for a best interest hearing. At this hearing, Busch testified that he visited Sheltanya in her foster home about once a month. Sheltanya had been in an adoptive foster home since approximately August of 1995. Busch testified that respon-

dent had several visits with Sheltanya. Busch supervised one visit and thought that it went well. Sheltanya told Busch that she liked the visit. Busch testified that Sheltanya was well bonded with the foster home where she lived. Busch recommended that respondent's parental rights be terminated and that a guardian with the right to consent to adoption be appointed.

The court found that it was in the best interests of Sheltanya that respondent's parental rights be terminated. The court noted respondent's criminal record and his lack of interest in Sheltanya.

Because the issues of fitness and the best interests of a child are decided in different stages of a bifurcated proceeding under the statute, we first address respondent's arguments regarding the court's findings at the fitness hearing, and then proceed to review the court's determinations at the best interest hearing.

In reviewing the court's finding of unfitness, we must first examine which version of the Adoption Act applies to the instant case.

Section 1(D)(m) of the Adoption Act formerly provided that a parent of a child adjudicated neglected is given 12 months to make reasonable progress toward the return of the child. 750 ILCS 50/1(D)(m) (West 1994). Effective January 1, 1998, the legislature amended section 1(D)(m) to provide that a parent of a child adjudicated neglected is given only nine months to correct the conditions that were the basis for the removal of a child before parental rights can be terminated. 750 ILCS 50/1(D)(m) (West 1998).

Here, the amendment to section 1(D) took effect after the finding of adjudication (August 5, 1992) but before the parental rights termination hearing commenced (May 26, 1998), and the termination hearing order was entered (September 1, 1998). The amendment to the Adoption Act was also effective at the time of the appeal.

■ It is well settled that a reviewing court is to "apply the law by its terms at the time of the appeal, unless doing so would interfere with a vested right." *In re K.P.*, 305 Ill. App. 3d 175, 178, 711 N.E.2d 478 (1999). Although respondent argues that he has a vested right in making reasonable efforts to correct the conditions that led to the removal of his child within 12 months after the adjudication of neglect, this court has specifically held that this obligation does not amount to a vested right. *In re Ladewig*, 34 Ill. App. 3d 393, 398, 340 N.E.2d 150 (1975). In *Ladewig*, the Adpotion Act of 1973 was amended to provide that a parent was unfit if he failed to make reasonable efforts towards the retention of a child within 24 months after adjudication of neglect. The court held that the Adoption Act was to be applied retroactively to parents of children who had been adjudicated neglected at the time the amendment went into effect because it did not affect any vested property right of the parent. *Ladewig*, 34 Ill. App. 3d at 398.

Here, as in *Ladewig*, no vested right exists where the legislature has an ongoing right to amend a statute. *First of America Trust Co. v. Armstead*, 171 Ill. 2d 282, 291, 664 N.E.2d 36 (1996). Therefore, we hold that the amended version of the Adoption Act applies to the instant case and that the recent amendment reducing the period for parental improvement to nine months applies in this case.

We next address the court's finding of unfitness which was based on several grounds. The Adoption Act provides for the following grounds of unfitness that are relevant to this case:

"D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following:
*** 

(b) Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare.

(c) Desertion of the child for more than 3 months next preceding the commencement of the Adoption proceeding.
* * *

(i) Depravity. ***

There is a *rebuttable presumption* that a parent is depraved if the parent has been criminally convicted of at least 3 felonies under the laws of this State or any other state, or under federal law, or the criminal laws of any United States territory; and at least one of these convictions took place within 5 years of the filing of the petition or motion seeking termination of parental rights.
* * *

(l) Failure to demonstrate a reasonable degree of interest, concern or responsibility as to the welfare of a new born child during the first 30 days after its birth.

(m) Failure by a parent to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent, or to make reasonable progress toward the return of the child to the parent within 9 months after an adjudication of neglected or abused minor ***. ***
*** 

(n) Evidence of intent to forego his or her parental rights, whether or not the child is a ward of the court, (1) as manifested by his or her failure for a period of 12 months: (i) to visit the child, (ii) to communicate with the child or agency, although able to do so and not prevented from doing so by an agency or by court order, or (iii) to maintain contact with or plan for the future of the child, although physically able to do so ***. ***

Contact or communication by a parent with his or her child that does not demonstrate affection and concern does not constitute reasonable contact and planning under subdivision (n). In the absence of evidence to the contrary, the ability to visit, communicate, maintain contact, pay expenses and plan for the future shall be presumed. The subjective intent of the parent, whether expressed or otherwise, unsupported by evidence of the foregoing parental acts manifesting that intent, shall not preclude a determination that the parent has intended to forego his or her parental rights. In making this determination, the court may consider but shall not require a showing of diligent efforts by an authorized agency to encourage the parent to perform the acts specified in subdivision (n).

It shall be an affirmative defense to any allegation under paragraph (2) of this subsection that the father's failure was due to circumstances beyond his control or to impediments created by the mother or any other person having legal custody. Proof of that fact need only be by a preponderance of the evidence.

\* \* \*

(s) The child is in the temporary custody or guardianship of the Department of Children and Family Services, the parent is incarcerated at the time the petition or motion for termination of parental rights is filed, the parent has been repeatedly incarcerated as a result of criminal convictions, and the parent's repeated incarceration has prevented the parent from discharging his or her parental responsibilities for the child." (Emphasis added.) 750 ILCS 50/1(D) (West 1998).

■ The court found respondent was an unfit parent based on subsections (b), (c), (l), (m), and (n). The court also found that respondent was unfit pursuant to subsections (i) and (s), which were alleged in the State's amended supplemental petition, on the grounds that respondent was depraved and that his repeated incarcerations would prevent him from discharging his duties as a parent. Any one of these grounds was sufficient to support the court's finding of unfitness. 750 ILCS 50/1(D) (West 1998). A finding of unfitness by the juvenile court must be supported in the proceedings by clear and convincing evidence. *In re A.J.*, 269 Ill. App. 3d 824, 827 (1994). We hold that the court's finding of unfitness on each ground was supported by clear and convincing evidence.

■ The court properly determined that respondent failed to maintain a reasonable degree of interest, concern or responsibility as to the Sheltanya's welfare; deserted Sheltanya for more than three

months next preceding the termination proceedings; failed to maintain a reasonable degree of interest, concern or responsibility as to Sheltanya's welfare within the first 30 days of Sheltanya's birth; failed to make reasonable efforts to correct the conditions that were the basis for Sheltanya's removal or to make reasonable progress toward Sheltanya's return within nine months after the adjudication of abuse and neglect; manifested an intent to forego his parental rights; was depraved due to his repeated convictions; and respondent's repeated incarceration has prevented him from discharging his parental responsibilities for Sheltanya.

Based on our review of the entire record, respondent's failure to maintain a reasonable degree of interest, concern or responsibility for Sheltanya's welfare is clear. Respondent was incarcerated at the time Sheltanya was born. There was no evidence that respondent called to inquire about Sheltanya or sent any gifts or otherwise evidenced a reasonable degree of interest, concern or responsibility as to Sheltanya's welfare within the first 30 days of her birth. See 750 ILCS 50/1(D)(l) (West 1998). Lillie S. testified that while she and respondent lived together with respondent's father, until Sheltanya was about two years old, respondent's father, and not respondent, would take care of Sheltanya. Lillie S. testified that respondent "came around" but did not pay child support.

After DCFS removed Sheltanya from Lillie's custody, respondent showed almost a total abdication of his parental responsibilities. When Sheltanya was about five years old and respondent visited her, he saw a burn on her arm. Instead of taking Sheltanya to the hospital or calling the police or DCFS, respondent had his mother treat the wound and then returned Sheltanya to her mother. The next day respondent went to visit Sheltanya, but she was gone. Then, for almost 16 months, during which respondent was not incarcerated, respondent did not know Sheltanya's whereabouts, but he did not call the authorities. For approximately another nine months while respondent was incarcerated from November of 1992 to August of 1993, he did not try to contact the police or anyone to determine Sheltanya's whereabouts. After respondent was released from prison on August 19, 1993, for a period of about 10 months, he again did not contact the authorities to attempt to find Sheltanya. Thus, respondent failed to make reasonable efforts to correct the conditions that were the basis for Sheltanya's removal or to make reasonable progress toward Sheltanya's return within nine months after the adjudication of abuse and neglect. See 750 ILCS 50/1D(m) (West 1998).

In order for a parent to make "reasonable progress" toward the return of a child, he or she must make "a minimum measurable or

demonstrable movement toward that goal." *In re Boolman*, 141 Ill. App. 3d 508, 511-12 (1986). Here, other than the initial letter respondent sent to Busch acknowledging that he was Sheltanya's father, respondent made no movement toward the goal of reuniting with Sheltanya but instead manifested an intent to forego his parental rights.

■ Respondent also deserted Sheltanya for more than three months next preceding the commencement of the adoption proceeding. Desertion connotes conduct indicating an intention to permanently terminate custody over a child while not relinquishing all parental rights. *In re Dawn H.*, 281 Ill. App. 3d 746, 757 (1996). Both parties cite to *Dawn H.*, which is on point. The respondent in *Dawn H.* also was repeatedly incarcerated. However, he was found to be unfit not based on his incarcerations alone, but based on his "failure for a period of 12 months to visit the child, to communicate with the child or agency, although not prevented by the agency or court order from doing so, or to maintain contact with or plan for the child's future, although physically not unable to do so." *Dawn H.*, 281 Ill. App. 3d at 757. Similarly here, no one prevented respondent from attempting to communicate with DCFS to ascertain Sheltanya's whereabouts. In a fitness determination, a parent's efforts, not the success of those efforts, are relevant. *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990). Where visitation is impossible, letters, cards, gifts, and telephone calls may suffice to show a parent's concern and interest in the children. *Syck*, 138 Ill. 2d at 279. Respondent evidenced a total lack of parental responsibility and concern.

■ Moreover, the court properly found respondent unfit based on his depravity alone, pursuant to subsection (i). See 750 ILCS 50/1(D)(i) (West 1998). A juvenile court could properly base its finding of depravity and parental unfitness on repeated incarcerations, regardless of other evidence demonstrating unfitness. *Dawn H.*, 281 Ill. App. 3d at 757-58. Here, respondent had seven felony convictions and was in and out of prison repeatedly. His numerous convictions evidenced "a series of acts or a course of conduct that indicates a moral deficiency and an inability to conform to accepted morality." *Dawn H.*, 281 Ill. App. 3d at 757, citing *In re B.C.*, 247 Ill. App. 3d 803 (1993). The court also properly found that respondent's numerous convictions and repeated incarceration have prevented him from discharging his parental responsibilities, as respondent implicitly recognizes. See 750 ILCS 50/1(D)(s) (West 1998).

Therefore, we affirm the court's order finding respondent an unfit parent.

■ Next, respondent appeals from the court's order determining that it was in Sheltanya's best interests to terminate respondent's

parental rights and appoint a guardian with authority to consent to adoption. Once a parent has been found unfit by clear and convincing evidence, the decision to terminate an individual's parental rights rests within the sound discretion of the trial judge. See *In re V.O.*, 284 Ill. App. 3d 686, 690 (1996). Upon review the trial court's findings will not be overturned unless they were against the manifest weight of the evidence. *In re Y.B.*, 285 Ill. App. 3d 385, 393 (1996). Because each case involving parental unfitness is *sui generis*, courts generally do not make factual comparisons to other cases. *In re A.S.B.*, 293 Ill. App. 3d 836, 843 (1997). Here, we find that the court properly found respondent unfit based on clear and convincing evidence and was well within its discretion in terminating respondent's parental rights.

Respondent raises two procedural arguments regarding both the court's finding of unfitness and its determination that terminating respondent's parental rights and appointing a guardian with authority to consent to Sheltanya's adoption was in Sheltanya's best interest. Respondent first argues that he did not fulfill certain goals outlined in the DCFS service plans because he did not know what was required because he was incarcerated and DCFS did not conduct a diligent search for him. Had DCFS truly conducted a diligent search, respondent argues, it would have found him sooner and he would have made more progress. Second, respondent also argues that DCFS had an obligation to explain the services and tasks outlined in his service plans and was required to check whether the institutions where respondent was incarcerated in fact offered those services.

Appellant does not cite any authority for his argument that DCFS indeed has such duties, in contravention of Supreme Court Rule 341(e)(7). See 155 Ill. 2d R. 341(e)(7) (appellant's brief must contain citations to the relevant authority supporting the argument advanced on appeal). Neither the statutory provisions nor DCFS regulations are entirely clear on either issue. However, the general statutory scheme and the scant authority that addresses these issues in the case law do not support appellant's arguments.

First, there is no clear, well-established rule on what constitutes a "diligent search" for a putative father when a petition for termination of parental rights is filed.

■ The Juvenile Court Act of 1987 (705 ILCS 405/2—16(2) (West 1994)) governs the issue of what constitutes a diligent search. *In re A.S.B.*, 293 Ill. App. 3d 836, 841 (1997). Section 2—16(2) states, in relevant part, that where a party's usual place of abode is unknown, "a diligent inquiry shall be made to ascertain" the party's current and last known address. 705 ILCS 405/2—16(2) (West 1994). If diligent inquiry does not reveal the party's location, then opposing counsel is

required to file an affidavit stating as such and indicating what efforts were made to effectuate service. 705 ILCS 405/2—16(2) (West 1994). After receiving this affidavit, the clerk of the court must then issue service by publication. 705 ILCS 405/2—16(2) (West 1994). Service by publication was issued in this case, and a certified copy of the notice is included in the record.

There is no authority that defines due diligence in the context of section 2—16(2) of the Juvenile Court Act, but this court has held that "due diligence" is "a universal concept." *A.S.B.*, 293 Ill. App. 3d at 842. This court in *A.S.B.* affirmed the efforts of DCFS to locate a parent based on similar efforts as in the case at bar. In an attempt to locate the father of A.S.B., DCFS first attempted to locate the natural mother. DCFS conducted a telephone directory assistance search, contacted the mother's relatives, checked the records of the Department of Public Aid, and visited previously listed addresses. *A.S.B.*, 293 Ill. App. 3d at 842. DCFS also checked the putative father registry, but no one was registered. *A.S.B.*, 293 Ill. App. 3d at 840. DCFS filed several affidavits of due diligence describing the efforts undertaken, and then notice by publication was made against the unknown father. *A.S.B.*, 293 Ill. App. 3d at 842. The petitioner in *A.S.B.* did not respond, and thus default judgment was entered, thereby terminating his parental rights. On appeal, this court held that the search DCFS conducted prior to filing its affidavit and publishing notice was diligent where the State and DCFS in particular made several attempts to locate the petitioner. This court held that DCFS conducted " 'that kind of search or investigation which a diligent person, intent on ascertaining a fact, would usually and ordinarily make.' " *A.S.B.*, 293 Ill. App. 3d at 842, quoting *In re Application of the County Collector for Judgment & Order of Sale Against the Lands & Lots Returned Delinquent for Nonpayment of General Taxes for the Year 1987 & Prior Years*, 278 Ill. App. 3d 168, 172 (1996).

■ Here, Darryl Applewhite, who worked on Sheltanya's case from October of 1993 to January of 1995 in his capacity as a case manager for Catholic Charities, testified that his search for respondent included a public aid search and a telephone directory search. This is similar to the efforts of DCFS in *A.S.B.* to locate the mother. Even though DCFS could not find the mother in *A.S.B.*, it did not perform a check of the Department of Corrections, and this court held DCFS' search was diligent. Applewhite testified that he did not conduct a Department of Corrections search because it was not proper practice at the time, though it subsequently became proper practice to do so. This testimony at the hearing was unrebutted. Moreover, respondent does not cite to any authority that is contrary to Applewhite's testimony, nor did our

own independent research reveal any authority that would show that the search Applewhite performed was not sufficient. Had respondent truly been concerned with Sheltanya, he would have contacted DCFS himself to inquire about his daughter. We hold that DCFS conducted a diligent search.

Respondent's second argument, that DCFS caseworkers had an obligation to arrange for visits at the prisons and to explain the service plans and ensure that the services that were listed in respondent's service plans were available at the institutions where respondent was incarcerated, is similarly unsupported by authority. Neither the statutory provisions nor the Department of Children and Family Services regulations in the Illinois Administrative Code provide guidance as to what DCFS's responsibilities are regarding the service plans it creates for individuals whose parental rights are in jeopardy of being terminated.

The Adoption Act specifically provides the following:

"If a service plan has been established as required under Section 8.2 of the Abused and Neglected Child Reporting Act to correct the conditions that were the basis for the removal of the child from the parent and *if those services were available*, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care within 9 months after the adjudication under Section 2—3 or 2—4 of the Juvenile Court Act of 1987." (Emphasis added.) 750 ILCS 50/1(D)(m) (West 1998).

There is no indication in the record that the court relied on respondent's nonfulfillment of the service plan goals in finding him unfit based on failure to make "reasonable progress" toward Sheltanya's return, and respondent does not argue that the trial court made such an erroneous finding. Rather, the limited issue we proceed to review here is whether DCFS has an affirmative duty to ensure that services listed in service plans are available at prisons where parents may be incarcerated.

■ Under the statutory scheme, DCFS has no obligation to arrange for visits with minor children at prisons or to inform parents who are incarcerated that they may send gifts or letters. Rather, under the statutory scheme the burden is on the parents to show a reasonable degree of interest, concern or responsibility as to the child's welfare. See 750 ILCS 50/1(D) (West 1994). However, DCFS does have some obligations regarding the implementation and review of service plans. Unfortunately, neither the relevant statutory provisions nor the DCFS regulations provide any guidance where a respondent is incarcerated and the services listed in a service plan are not available.

Our research has uncovered only one case that resembles respondent's. In *In re T.D.*, 268 Ill. App. 3d 239 (1994), this court rejected a claim by a respondent that he could not fulfill the goals in his service plan, and thus could not make "reasonable progress" toward the return of his child, where DCFS failed to inform him while he was in prison of the various service plans that were created. In *T.D.*, there was no indication that any DCFS worker ever contacted the Department of Corrections to locate respondent to inform him of the service plans. *T.D.*, 268 Ill. App. 3d at 246. However, this court held that "DCFS' handling of [the] case [was] inexcusably clumsy" and that, under the circumstances of that case, the respondent's failure to complete the tasks, standing alone, could not support the finding of unfitness. *T.D.*, 268 Ill. App. 3d at 247. This court went on to find the respondent was properly found unfit based on the respondent's failure to contact DCFS or in any way manifest concern for his children. *T.D.*, 268 Ill. App. 3d at 247.

Here, the handling of respondent's case by DCFS was much better than in *T.D.*, in that respondent was sent all service plans, but respondent did not avail himself of the opportunity to contact DCFS to tell someone that the services were not available and to ask for some other help in reuniting him with his daughter. Thus, we hold that DCFS fulfilled its obligations under the law. The court correctly determined that respondent was unfit and that it was in Sheltanya's best interests to terminate respondent's parental rights and appoint a guardian with authority to consent to Sheltanya's adoption.

Affirmed.

CAMPBELL, P.J., and BUCKLEY, J., concur.