No. 3--98--0096

November 13, 1998

_________________________________________________________________

 IN THE

 APPELLATE COURT OF ILLINOIS

 THIRD DISTRICT

 A.D., 1998

IN THE INTEREST OF              ) Appeal from the Circuit Court

A.L. & R.L., ) of the 12th Judicial Circuit,

       ) Will County, Illinois,

     Minors                     )

 )

(THE PEOPLE OF THE STATE )

OF ILLINOIS, )

 )

Petitioner-Appellee, ) No. 91--J--2429

 )

v. )

 )

HERIBERTO L., JR.,              ) Honorable

                                ) Vincent Cerri,

Respondent-Appellant). ) Judge, Presiding.

_________________________________________________________________

JUSTICE SLATER delivered the opinion of the court:

_________________________________________________________________

The respondent, Heriberto L., Jr., was found to be an unfit parent by reason of depravity.  750 ILCS 50/1(D)(i) (West 1996).  His paren­tal rights to his children, 10-year-old A.L. and 8-year-

old R.L., were later termi­nat­ed.  On appeal, the respon­dent argues that the trial court's decision to find him unfit was against the manifest weight of the evidence be­cause:  (1) his conviction for first degree murder of the minors' mother, standing alone, was not suffi­cient evidence of depravi­ty; and (2) aside from his conviction for murder, there was a lack of evidence showing his inabili­ty or unwillingness to conform to acceptable moral stan­dards.  We affirm. 

On November 19, 1993, the State filed a petition to terminate the respondent's parental rights on the ground that he was depraved.  750 ILCS 50/1(D)(i) (West 1996).  The basis for the petition stemmed from the respondent's conviction for first degree murder of the minors' mother and the respondent's wife, Nancy L.  The murder oc­curred on October 8, 1990, after the respondent repeatedly collided his vehicle into the vehicle that Nancy was driving.  The respondent was also convicted of two counts of aggravated battery for the injuries he inflicted upon Nancy's two surviving passengers.  

The transcript of the respondent's murder trial was admit­ted into evidence at the fitness hearing.  In those transcripts, Rodney Ellis testi­fied that on October 8, 1990, he was in the front passenger seat of a vehicle driven by Nancy L.  Andre Cory was in the back seat.  As Nancy drove eastbound on Route 30, Ellis heard a car horn and saw the respondent driving a vehicle next to them on the passen­ger side.  When Nancy saw the respondent, she screamed, "He's going to kill me.  He's going to kill me."  The respondent then sideswiped Nancy's car twice on the passenger side, causing Nancy's engine to stall.  The respondent then passed them, stopped his vehicle, ran over to Nancy's vehicle, and began to kick the front passen­ger window.  Nancy then re­started her vehicle.  The respondent got back in his vehicle, backed up, and struck Nancy's vehicle a third time.  Nancy continued to drive eastbound on Route 30 when the respondent rammed her from behind.  She then turned north on Ellis Street, and the respon­dent struck the vehicle a fifth time.  The impact from the fifth collision caused Nancy's vehicle to leave the road and strike a tree.  

Ellis said that after the vehicle struck the tree, the respondent drove his vehicle into the driver's side of Nancy's vehicle.  Ellis was pinned to the back seat when he saw the respondent reach into the vehicle and pull Nancy out through the driver's side window.  Nancy was screaming at the time.  Ellis was later cut out of the vehicle and taken to a hospital.  He remained there until February 1991 for treatment of numerous serious injuries.

Andre Cory's testimony essentially corroborated Ellis's testimony up until the respondent struck Nancy's vehicle while on Ellis Street.  At that point, Cory became unconscious.  He regained consciousness in the hospital where he remained for two weeks.   

Several other eyewitnesses testified that after the respondent pulled Nancy out of the car he threw her over his shoulder and carried her behind a nearby house.  When he reached the house, the respondent threw Nancy down on a concrete slab.  He then picked her up, carried her to the front of the house, and dropped her again.  One of the eyewitnesses, Charles Knox, Jr., testified that he asked the respondent what had happened after he saw the respon­dent drop Nancy on the con­crete in the back of the house.  According to Knox, the respondent said, "those damn niggers."  The respondent then grabbed Nancy by the hair and said, "look, those damn niggers," and dropped her head.    

The respondent also testified at his murder trial.  According to him, on Octo­ber 8, 1990, he and Nancy had discussed reconciling after being separated for two weeks.  Around 

10 p.m., Nancy tele­phoned him from a gas station and said she was stranded.  The respondent was later driving west­bound on Route 30 when he saw his wife driving eastbound with two passen­gers in her car.  He made a U-turn, yelled at her to stop, and then bumped her vehicle twice with his vehicle to make her pull over.  When Nancy's vehicle stalled, he pulled in front of it to block it and then hit it in the front end.  After he pounded on the window of her vehicle, Nancy started to get out of the vehicle but the man in the passenger seat pulled her back.  The respondent said when Nancy restart­ed the vehicle it rolled backward and collided with his vehicle (which, he said, was then located behind her vehicle).  

The respondent then followed the victims.  He said the road was wet and slippery and Nancy was driving too fast.  When she turned north on Ellis Street, the vehicle went off the road and hit a tree.  He did not hit the vehicle from behind on Ellis Street and did not hit it after it struck the tree.  He also claimed he pulled Nancy from the vehicle and gently placed her on the ground.  

At his sentencing hearing, the respondent made no statement of remorse.

At the fitness hearing, Joyce Horton, a friend of Nancy's, testified that a month before Nancy was murdered, she was speaking with Nancy on the telephone and overheard the respondent say to Nancy, "I don't see why you want to hang around those niggers anyway."  He called Joyce "Buckwheat" and referred to Nancy's friends as "niggers."

Horton further testified that in September 1990 she and Nancy went to Nancy's home after shopping and found that the respondent had put garbage bags of Nancy's clothes on the porch.  According to Horton, the respondent threw Nancy out of the house that day.  Nancy lived with Horton from that point until her death.

Irene Greenwalt, Nancy's mother, testified that she went to the respondent and Nancy's home on the day of the murder after Nancy called her in tears.  Nancy told Greenwalt that the respondent forced her to tele­phone all of her black friends and say she could no longer be their friend.  That same day, the respondent told Greenwalt that he had previously abused Nancy.  He told Greenwalt that he had just "worked her up a little bit" and that he had to show her who was the man of the house.

Greenwalt also said that when the respondent visited Nancy in the hospital before she died, he held her hand to his face and said, "I can still smell the nigger on you."  Nancy then wailed.

Several witnesses testified on the respondent's behalf, including two ministers and his father.  Generally, these witnesses testified that the respondent was a good man and a good father.  They never witnessed any occur­rences between the respondent and Nancy that would cause them concern.  On cross-examina­tion, one of the ministers, Reverend Paul Rodri­guez, said that the respon­dent told him that he had grabbed Nancy and tried to help her after the collision.  Rodriguez said the respondent admitted striking his vehicle into Nancy's vehicle.  He also heard the respondent state that he was sorry for the consequences of his actions.  

The respondent then testified and said that he loved his children.  He described his work duties at Pontiac Correctional Center (Pontiac) as well as his affiliation with religious groups in the prison.  The respondent expressed regret for what occurred on the evening of October 8, 1990, and expressed his love for Nancy.  He said he held Nancy's hand during the ambulance ride to the hospital and visited her in the hospital before she died.  However, the respondent did not acknowledge full responsibility for the injuries to the occupants of Nancy's vehicle and said his conviction was currently under appeal.  He expressed sorrow for the injuries inflicted upon the two men in the car.  He denied that his vehicle struck Nancy's vehicle on Ellis Street or forced it to leave the roadway.  He admitted picking up Nancy from the vehicle because, in his opinion, Nancy was unable to leave the vehicle on her own.  He said he carried her in a vertical position but denied that he threw her onto the porch, grabbed her by the hair, or said, "those damn niggers."  

Ronald A. Beech, a captain at Pontiac, testified that the respondent's interaction with the guards was positive and respectful and he had not received any disciplinary citations.

After hearing all testimony, the trial court found the respondent to be an unfit parent.  On June 19, 1997, a best inter­est hearing was held.  The trial court subsequently found that it was in A.L. and R.L.'s best interest to terminate the respondent's parental rights.

On appeal, the respondent argues that the trial court erred in finding him to be an unfit parent on depravity grounds.  See 750 ILCS 50/1(D)(i) (West 1996).  Specifically, he contends:  

(1) his conviction for first degree murder, standing alone, was not suffi­cient evidence of depravi­ty; and (2) aside from his convic­tion for murder, there was a lack of evi­dence showing his inabil­i­ty or unwillingness to conform to acceptable moral standards. 

Depravity is defined as an inherent deficiency of moral sense and rectitude.  
In re Abdullah
, 85 Ill. 2d 300, 423 N.E.2d 915 (1981).  A single criminal conviction, without more, will not support a finding of unfitness based on depravity.  
In re Abdullah
, 85 Ill. 2d 300, 423 N.E.2d 915 (1981).  The statuto­ry ground of depravity requires the trier of fact to closely scrutinize the character and credibility of the parent and the review­ing court will give such a determina­tion deferential treatment.  
In re Perez
, 173 Ill. App. 3d 922, 528 N.E.2d 238 (1988).  A finding of paren­tal unfit­ness must be sup­port­ed by clear and convincing evidence.  
In re Allen
, 172 Ill. App. 3d 950, 527 N.E.2d 647 (1988).  On review, the trial court's decision regard­ing the fitness of a parent should not be reversed unless it is contrary to the manifest weight of the evidence.  
In re B.C. & W.C.
, 247 Ill. App. 3d 803, 617 N.E.2d 1207 (1993).    

Here, there was ample evidence of depravity sufficient to find the respondent an unfit parent.  He was convicted of first degree murder, a crime inherently deficient in a moral sense.  See 
In re Abdullah
, 85 Ill. 2d 300, 423 N.E.2d 915 (1981).  Further, he murdered the 
mother
 of his children, an act which will forever alter those children's lives.  He also injured Mr. Ellis and Mr. Cory severely enough for them to endure extended hospital stays and for which he was convicted of two counts of aggravated battery.  Lastly, the record is replete with references to the respondent's bigotry as well as his cruelty to Nancy before the collision and as she lay dying in the hospital.  For these reasons, we find that the trial court's finding of depravi­ty was not against the manifest weight of the evidence.

The judgment of the circuit court of Will County is affirmed.

Affirmed.

HOMER, P.J., and LYTTON, J., concur.