*In re* J.A., a Minor, Respondent-Appellee Proceeding as Appellant by Leave of Court (The People of the State of Illinois, Petitioner-Appellant, v. Angel Rosado, Respondent-Appellee).

First District (5th Division)    No. 1—99—0768

Opinion filed September 15, 2000.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Jennifer Streeter and Margaret Blade, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Public Guardian, of Chicago (Ron Fritsch, of counsel), for J.A.

Northwestern University Legal Clinic, of Chicago (Bruce A. Boyer, of counsel), for appellee Angel Rosado.

PRESIDING JUSTICE QUINN delivered the opinion of the court:
On July 8, 1998, the State filed a petition to terminate the parental rights of J.A.'s biological parents. The State claimed that Angel Rosado, J.A.'s biological father, was unfit because he was depraved (750 ILCS 50/1(D)(i) (West 1998)) and because he failed to make reasonable efforts or reasonable progress toward unification with J.A. (750 ILCS

50/1(D)(m) (West 1998)). The trial court found that Rosado was not unfit. (J.A.'s biological mother did not appear before the trial court and was found unfit.) The State and guardian *ad litem* now appeal the ruling of the trial court as to Rosado's fitness.

Minor-respondent J.A. is a girl who was born on September 3, 1992. At the time of J.A.'s birth, her biological mother had been using heroin and cocaine for approximately 11 years. J.A. was born one month premature, weighed slightly more than five pounds, and tested positive for cocaine. The biological mother was indicated by the Illinois Department of Children and Family Services (DCFS) for substance misuse at J.A.'s birth, but she was allowed to retain custody of J.A.

On April 22, 1993, an order of parentage was entered naming Angel Rosado as J.A.'s father, based on the results of a paternity test. Once paternity was established, Rosado began visiting J.A., paying child support, and retaining health insurance for her. At the fitness hearing, Rosado testified that he asked the biological mother to give him custody of J.A. so that the biological mother could get treatment for her drug addiction. However, Rosado testified that the biological mother refused to do so.

On the evening of June 17, 1995, J.A.'s biological mother was arrested for prostitution. The biological mother telephoned Maria Acevedo, J.A.'s maternal grandmother, and asked Acevedo to go to the mother's apartment and pick up J.A. When Acevedo arrived at the biological mother's apartment, the door was locked and she could not get in. In an attempt to gain access to the apartment, Acevedo told the janitor and the landlord of the building that J.A. was in the apartment alone. The landlord notified the police, who arrived approximately two hours later at 12:50 a.m. The police immediately took J.A. to their station and called DCFS.

On June 18, 1995, the biological mother was indicated for inadequate supervision of J.A. and DCFS took protective custody of J.A. On June 19, 1995, J.A. was placed in relative foster care with her maternal grandmother, Maria Acevedo. On June 20, 1995, DCFS was given temporary legal custody of J.A.

DCFS failed to locate Rosado and inform him of the status of his daughter. DCFS and Child Serv documents stated that Rosado's status and whereabouts were unknown. The initial publication notice, on July 14, 1995, also incorrectly listed J.A.'s father as Navarrette Melchor. Proper publication notice to Rosado was not made until September 6, 1995.

Rosado testified that he was initially unaware that J.A. had been removed from her mother's home. He stated that it was not unusual

that he was unable to visit J.A. because it was common for her biological mother to refuse to allow him to visit. After a series of visits to J.A.'s biological mother's house with no answer at the door, Rosado went to J.A.'s grandmother's home. It was there that he learned that J.A. was in the temporary legal custody of DCFS and that Acevedo was acting as a foster parent to J.A.

Following notification, Rosado appeared in court on October 6, 1995. J.A. was adjudicated a neglected minor and a ward of the court on November 22, 1995.

An initial service plan dated August 1, 1995, makes no mention of Rosado and contains no service recommendations for him. Rosado's first contact with DCFS apparently occurred sometime shortly before the second administrative case review (ACR), scheduled for December 8, 1995. Baltazar Ordonez, the assigned caseworker from Child Serv, a private agency acting under contract with DCFS to provide services, informed Rosado of the upcoming ACR, but Rosado told Ordonez that he could not attend because of work commitments. The service plan resulting from the ACR contained a task sheet for Rosado, recommending two specific services: a psychological evaluation and a drug and alcohol assessment. The task sheet also recommended generally that Rosado sign releases of information, inform DCFS of his whereabouts, and comply with court orders. In addition, the service plan included a court-ordered visitation schedule for Rosado, which allowed him to visit J.A. once a week.

By February of 1996, Rosado had completed both the psychological evaluation and the substance abuse assessment and had authorized disclosure of the reports to DCFS. While the psychological evaluation stated that Rosado "might benefit from participation in Anger Management and Stress Management classes," neither that evaluation nor the drug and alcohol assessment made recommendations for specific follow-up services. Rosado also submitted to a drug test on January 26, 1996, the results of which were negative. Rosado continued to visit J.A. at least once per week, supervised by the foster mother, until he was incarcerated in October of 1996.

In June of 1996, DCFS conducted a third ACR and prepared a revised service plan. Although Rosado attended the ACR, the June 1996 service plan does not contain a review of Rosado's progress toward achieving the goals set out in the December plan. A revised task sheet for Rosado recommended family counseling, follow-up on recommendations from the previous psychological evaluation, signing of release forms, and cooperation with DCFS.

Though not included specifically in the June 1996 service plan, Ordonez also requested that Rosado complete anger management

counseling. It is unclear from the record whether this recommendation was made before or after an alleged encounter in which Ordonez claimed that Rosado made threatening remarks about him to his supervisor. Rosado denied making any threats and the trial court found that Ordonez' testimony regarding the incident was not credible. The first written record of a request for anger management counseling was not made until September 6, 1996, more than nine months after the date of the adjudicatory hearing.

Rosado reported in his answers to interrogatories that, in or around May of 1996, he did in fact attend three sessions of anger management counseling with Edgardo Torres. According to Rosado, Torres told Rosado that his frustration with DCFS was justified and that he did not need to return for more sessions.

In July of 1996, Rosado filed a motion for custody of J.A. The motion was never presented at a hearing, however, because Rosado was convicted of possession of narcotics and incarcerated for approximately five months, beginning on October 7, 1996. As a result of this conviction, Rosado was in prison until March 28, 1997. Rosado's incarceration precluded him from immediately pursuing family counseling at the Midwest Family Resource Center, which Ordonez had recommended sometime after June of 1996. Apparently unaware that Rosado had been to a counselor, Ordonez also continued to recommend anger management counseling. Rosado maintained contact with J.A. during his incarceration through telephone calls. After his release from prison, Rosado resumed visiting J.A. even more often than recommended by DCFS. In 1998, Rosado also began taking parenting classes that were ongoing at the time of trial.

On July 8, 1998, the State filed a petition to terminate the parental rights of both Rosado and J.A.'s biological mother.[1] As to Rosado, the initial petition alleged that Rosado was unfit under sections 1(D)(b) and (D)(m) of the Adoption Act (750 ILCS 50/1(D)(b),(D)(m) (West 1998)). Subsequently, the trial court granted the State leave to amend its pleading to additionally allege unfitness under section 1(D)(i) and withdraw its claim under section 1(D)(b). The State thus proceeded to trial with the grounds for unfitness against Rosado based on sections 1(D)(i) (depravity) and 1(D)(m) (failure to make reasonable efforts or reasonable progress) of the Adoption Act (750 ILCS 50/1(D)(i), (D)(m) (West 1998)).

Prior to trial, on August 10, 1998, Rosado filed a second request

---

[1]J.A.'s biological mother did not appear before the trial court in these proceedings. At the conclusion of the trial, the court found her unfit. This finding is not at issue in this appeal.

for custody of J.A. This petition was heard on December 9, 1998. At the hearing, the court heard testimony in support of Rosado's motion from Rosado himself, his wife, and his 18-year-old son. In opposition to the motion, the State presented testimony from the caseworker at the time of the hearing, Cheska Avery, and from J.A.'s foster mother, Maria Acevedo. At the conclusion of the hearing, the trial court ordered that Rosado be allowed unsupervised visits with J.A. and continued the matter for trial on the State's petition to terminate parental rights.

On January 6, 1999, the trial began on the State's petition to terminate parental rights. The State's principal witness was Baltazar Ordonez, who was assigned to J.A.'s case from September of 1995 to September of 1996—a one-year period encompassing the nine months following adjudication. Ordonez testified, among other things, that Rosado was required to complete certain services which in fact were not actually a part of any of Rosado's service plans. Ordonez also testified that he was unaware that Rosado had completed service tasks actually required by his service plans during the relevant time frame. Ordonez concluded that Rosado failed to do any of the requested services during the time Ordonez was on the case and that Rosado was unwilling to cooperate with caseworkers at all. However, upon cross-examination, Ordonez acknowledged that he had signed a report dated July 26, 1996, indicating that Rosado had taken steps toward unification with J.A.

The State and guardian *ad litem* (GAL) also introduced a series of trial exhibits, including records reflecting Rosado's three felony convictions. In addition to his aforementioned conviction for possession of narcotics, these included convictions in 1984 for voluntary manslaughter and in 1994 for aggravated stalking.

During his testimony at the previous hearing, on December 9, 1999, Rosado had explained the circumstances of each of his convictions. With respect to the 1984 conviction, over the State's objection, Rosado explained that he was convicted of voluntary manslaughter as a result of a fight in a bar that occurred in 1982, 10 years before J.A.'s birth. Rosado testified that the killing occurred after he took a gun away from someone who pulled it on him and the gun discharged. Rosado did not serve any time in prison for that conviction, but received four years' probation.

As to the 1994 conviction for aggravated stalking, Rosado stated that after his former fiancée learned that he was J.A.'s father, she obtained an order of protection against him. According to Rosado's testimony, he went to retrieve his belongings from her apartment in violation of the order on several occasions and was convicted of ag-

gravated stalking. As a result, Rosado was incarcerated from August of 1994 through March of 1995.

As to his conviction for possession of narcotics in 1996, Rosado testified that he was arrested as he was visiting his brother's home and walked into a drug raid. After a jury trial, Rosado was convicted and sentenced to one year in prison, of which he served six months.

At the conclusion of the trial on the termination of Rosado's parental rights on January 6, 1999, at the request of Rosado's counsel and following lengthy arguments, the trial court agreed to review and consider the testimony from the December 9 hearing on Rosado's request for custody. The trial court noted that the case was not being heard before a jury, that the transcript would be considered in the interests of judicial economy, and that the court would consider testimony from the earlier hearing only as it was relevant and admissible to the trial at hand. The judge then continued the case to February 4, 1999, in order to have an opportunity to thoroughly review the evidence before the court.

Following arguments on February 4, 1999, the trial court found that Rosado was not unfit under either section 1(D)(i) or 1(D)(m) of the Adoption Act. The court concluded that while information about Rosado's whereabouts had been readily available from the outset of the case, Acevedo and J.A.'s biological mother had colluded to prevent DCFS from contacting Rosado and engaging him in services. The court also noted that Rosado had maintained a relationship with J.A. from the time his paternity was established. With respect to the charge of depravity, the trial court reviewed each of Rosado's convictions and carefully considered Rosado's evidence in rebuttal. For example, with respect to the charge of narcotics possession, the court found that Rosado's negative drug test, his substance abuse evaluation, and his regular employment supported the conclusion that he does not have a problem with substance abuse. The court dismissed the hearsay claim of Acevedo that Rosado was a drug dealer as incredible and inconsistent with the evidence. Instead, the court relied on evidence of Rosado's commitment to J.A., his positive relationships with other family members, his constant employment, his taking of responsibility for his actions, and his demeanor in court.

With respect to the claims that Rosado had failed to make reasonable efforts or reasonable progress in the nine months following adjudication, the trial court noted that Rosado had maintained a constant and loving relationship with J.A. throughout and beyond the relevant time period and acknowledged the services he completed during that time. The court concluded that Rosado had completed all the services reasonably connected to the goal of reunification. The court

also acknowledged that DCFS and Child Serv continued to recommend anger management counseling after Rosado completed his sessions with Torres, but rejected the conclusion that Rosado was in need of such counseling.

The court further found that the testimony of Ordonez was incredible, in that he could not recall or was unaware of the services that Rosado in fact completed. The court concluded that, in forming his negative opinions about Rosado, Ordonez had relied heavily on Acevedo, who, the court determined, had been deceitful, manipulative, and unbelievable. The court concluded that Ordonez' testimony about Rosado's threatening remarks to a supervisor was incredible and his view that Rosado needed anger management counseling was a reaction to the intervention of Rosado's lawyer rather than a reasonable recommendation for needed services. Accordingly, the court dismissed Ordonez' conclusions about Rosado's failure to make progress as incredible and inconsistent with the evidence.

The transcript of proceedings below concludes with a permanency hearing conducted immediately after the trial determining fitness. Following this hearing, the trial court awarded Rosado weekend visits and asked him to arrange for day care so that J.A. could be moved to his home full-time. The court also indicated its intent to return J.A. to Rosado as quickly as possible, setting the matter for a return home hearing on March 22, 1999. However, the permanency hearing is not at issue here, as the State did not appeal.

The State and the GAL appeal the trial court's finding that Rosado was not unfit. They argue that Rosado should have been found unfit because he did not rebut the statutory presumption of depravity based on three felony convictions and he did not make reasonable efforts to correct the conditions that were the basis for J.A.'s removal from her mother's custody or reasonable progress toward unification with J.A. The State and GAL also argue that the trial court's finding as to Rosado's fitness was in error because it was based on testimony regarding J.A.'s best interests. The GAL and the State further assert that the trial court erred in that it rejected the State's witnesses' testimony without due consideration and the court did not limit its deliberations to the evidence presented. Finally, they claim that the trial was not conducted in front of an unbiased, open-minded trier of fact.

For the following reasons, we disagree and we affirm the finding of the trial court that Rosado is not unfit.

■ Before the State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence.

*Santosky v. Kramer*, 455 U.S. 745, 747-48, 71 L. Ed. 2d 599, 603, 102 S. Ct. 1388, 1391-92 (1982). Reviewing courts must give great deference to a trial court's finding of fitness and must not reverse such a finding unless it is against the manifest weight of the evidence. *In re C.M.*, 305 Ill. App. 3d 154, 163, 711 N.E.2d 809 (1999). A trial court's finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *In re C.M.*, 305 Ill. App. 3d at 163. Further, because each case involving parental unfitness is *sui generis*, courts do not make factual comparisons to other cases. *In re C.M.*, 305 Ill. App. 3d at 163.

■ The State alleged that Rosado was an unfit parent because he was depraved, under section 1(D)(i) of the Adoption Act (750 ILCS 50/1(D)(i) (West 1998)). In order to sustain its claim against Rosado under subsection (i), the State's burden was to prove by clear and convincing evidence that Rosado was depraved. The Illinois Supreme Court has accepted the definition of depravity as "an inherent deficiency of moral sense and rectitude." *Stalder v. Stone*, 412 Ill. 488, 498, 107 N.E.2d 696 (1952). Illinois courts have required that, in order to establish unfitness, clear and convincing evidence of depravity must be shown to exist at the time of the petition, and the "acts constituting depravity *** must be of sufficient duration and of sufficient repetition to establish a 'deficiency' in moral sense and either an inability or an unwillingness to conform to accepted morality." *In re Adoption of Kleba*, 37 Ill. App. 3d 163, 166, 345 N.E.2d 714 (1976).

Prior to June 30, 1998, subsection (i) consisted only of the single word "depravity." In Public Act 90—608, effective June 30, 1998, the legislature amended subsection (i) to include three paragraphs. The first paragraph provides that a conviction of any one of certain listed crimes creates "a presumption that a parent is depraved which can be overcome only by clear and convincing evidence." 750 ILCS 50/1(D)(i) (West 1998). The second and third subparagraphs provide that convictions of certain other crimes create a "rebuttable presumption" that a parent is depraved. 750 ILCS 50/1(D)(i) (West 1998).

This appeal involves the second paragraph of subsection (i), which creates "a rebuttable presumption that a parent is depraved if the parent has been criminally convicted of at least 3 felonies *** and at least one of these convictions took place within 5 years of the filing of the petition or motion seeking termination of parental rights." 750 ILCS 50/1(D)(i) (West 1998). Rosado stipulated that he had been convicted of the following felonies on the following dates: (1) involuntary manslaughter on April 3, 1984; (2) aggravated stalking on July 28, 1994; and (3) possession of cocaine on July 25, 1996. These convictions brought Rosado squarely within the ambit of amended subsection (i).

■ However, Rosado argues that subsection (i), as amended, should not apply to him because his three felony convictions were entered prior to June 30, 1998, and application of the amended statute to him would be an impermissible "retroactive application" of a new law. Rosado concedes that the current status of the law in Illinois is that a parent's right or interest in his children does not constitute an absolute vested property right, as established in *In re Ladewig*, 34 Ill. App. 3d 393, 398, 340 N.E.2d 150 (1975). However, Rosado claims that the application of the amended version of subsection (i) to this case would deprive him of his procedural due process rights. Rosado explains in his brief to this court that at the time of his third conviction he "had no reason to assume that the mere fact of his third conviction—for circumstances that would not otherwise support a finding of depravity—might subject him to the loss of this relationship [with J.A.]." We disagree.

Subsection (i), as amended, did not create a new ground of unfitness. The current subsection (i) created only a "rebuttable presumption" as to what constitutes depravity, which itself has been a ground of unfitness in the Adoption Act for many years. Although a single felony conviction was traditionally not enough, a number of felony convictions were sufficient to establish depravity even under the old section. *In re Dawn H.*, 281 Ill. App. 3d 746, 757, 667 N.E.2d 485 (1996). The legislature has never explicitly stated what number and what magnitude of crimes is sufficient for a *finding* of depravity, but the amendment to subsection (i) has specified what number and magnitude will create a *rebuttable presumption* of depravity. Because the presumption is rebuttable; a parent is still able to present evidence showing that, despite his convictions, he is not depraved.

Thus, Rosado should have been aware, even under the original subsection (i), that each time he committed a crime he was taking a risk that the juvenile court would find him depraved based upon the seriousness and number of his convictions. Hence, we find that Rosado was not deprived of his right to procedural due process, and no other vested rights were affected, by the application of the amended version of subsection (i) to this case.

■ A rebuttable presumption creates "a *prima facie* case as to the particular issue in question and thus has the practical effect of requiring the party against whom it operates to come forward with evidence to meet the presumption." *Diederich v. Walters*, 65 Ill. 2d 95, 100, 357 N.E.2d 1128 (1976). However, once evidence opposing the presumption comes into the case, the presumption ceases to operate, and the issue is determined on the basis of the evidence adduced at trial as if no presumption had ever existed. *Diederich*, 65 Ill. 2d at 100-01. The

burden of proof does not shift but remains with the party who initially had the benefit of the presumption. *Diederich*, 65 Ill. 2d at 101. The only effect of the rebuttable presumption is to create the necessity of evidence to meet the *prima facie* case created thereby, and which, if no proof to the contrary is offered, will prevail. *Diederich*, 65 Ill. 2d at 102.

The amount of evidence that is required from an adversary to meet the presumption is not determined by any fixed rule. *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 463, 448 N.E.2d 872 (1983). A party may simply have to respond with some evidence or may have to respond with substantial evidence. *Franciscan Sisters*, 95 Ill. 2d at 463. If a strong presumption arises, the weight of the evidence brought in to rebut it must be great. *Franciscan Sisters*, 95 Ill. 2d at 463. The statutory ground of depravity requires the trier of fact to closely scrutinize the character and credibility of the parent and the reviewing court will give such a determination deferential treatment. *In re A.L.*, 301 Ill. App. 3d 198, 202, 702 N.E.2d 1021 (1998).

■ In this case, there is no question that the State presented evidence that was sufficient to give rise to the rebuttable presumption that Rosado was depraved. Rosado stipulated to the fact that he has been convicted of three felonies and that one of them occurred within five years of the filing of the petition for termination of parental rights. However, the trial court specifically found that Rosado had rebutted the presumption of depravity by clear and convincing evidence. As stated above, this court must give great deference to the trial court's determinations of the character and credibility of the witnesses.

The court went on to say that it was impressed with the testimony given by Rosado's wife and son. Rosado's wife testified that she and Rosado had prepared a room in their home for J.A. in case Rosado was awarded custody. Rosado's son testified that Rosado had been a good father to him, who provided for both his physical and emotional needs. Several of the witnesses, both for the State and for Rosado, testified that Rosado visited J.A. regularly and that he often visited more frequently than the service plan suggested. The court found that Rosado's evidence showed that he was in constant contact with his children (including J.A.), and that he had been a constant support to them both financially and emotionally.

In light of the aforementioned evidence, upon which the trial court based its determination, this court cannot say that it is clearly apparent that Rosado is depraved and an unfit parent. Thus, we uphold the finding of the trial court that the State did not prove by clear and convincing evidence that Rosado was depraved under section 1(D)(i) of the Adoption Act.

■ The State has also alleged that Rosado was an unfit parent because he did not make reasonable efforts to correct the conditions that were the basis for the removal of J.A. or make reasonable progress toward the return of J.A. within nine months of the adjudication of neglect, as required by section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 1998)). The trial court determined that Rosado had made reasonable efforts and reasonable progress toward reunification with J.A. We find that the trial court's ruling was supported by the manifest weight of the evidence.

Section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 1994)) provides two grounds for a finding of parental unfitness: (1) failure to make reasonable progress toward the return of the child; and (2) failure to make reasonable efforts to correct the conditions that were the basis for removal of the child. *In re C.M.*, 305 Ill. App. 3d 154, 163, 711 N.E.2d 809 (1999). Although the two bases coexist within the same subparagraph of the Adoption Act, they are distinct, each requiring separate analysis. *In re C.M.*, 305 Ill. App. 3d at 163-64. However, only one ground of unfitness need be proved to find a parent unfit. *In re J.P.*, 261 Ill. App. 3d 165, 174, 633 N.E.2d 27 (1994).

Section 1(D)(m) states that a parent must make reasonable efforts or reasonable progress "within nine months after an adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m) (West 1998). The Illinois Supreme Court recently decided that this language in subsection (m) also "limits the evidence that may be considered under the provision to matters concerning the parent's conduct in the [nine months] following the applicable adjudication of neglect." *In re D.L.*, 191 Ill. 2d 1, 10 (2000). If a parent is found unfit under subsection (m), evidence of the parent's conduct occurring more than nine months after the adjudication of neglect may be introduced at the second stage of the termination proceedings, at which the court must consider the best interests of the minor involved in determining the youth's eventual placement. *In re D.L.*, 191 Ill. 2d at 12.

J.A. was adjudicated a neglected minor on November 22, 1995. Thus, the relevant time period for determining Rosado's fitness under subsection (m) is from November 22, 1995, to August 22, 1996.

Reasonable progress is an objective standard, focusing on the amount of progress toward the goal of reunification one can reasonably expect from the parent under the circumstances. *In re C.M.*, 305 Ill. App. 3d at 164. Reasonable progress relates to progress toward the broadly defined goal of the return of the child to the natural parent. *In re C.M.*, 305 Ill. App. 3d at 164. The standard by which progress is to be measured is parental compliance with the court's directives, the DCFS service plan, or both. *In re L.L.S.*, 218 Ill. App. 3d 444, 463-64,

577 N.E.2d 1375 (1991). However, a parent might succeed at reaching a goal envisioned by DCFS without following its specific directives. *In re S.J.*, 233 Ill. App. 3d 88, 120, 598 N.E.2d 456 (1992). The court is to make an objective judgment based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re M.C.*, 201 Ill. App. 3d 792, 798, 559 N.E.2d 236 (1990). At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification. *In re M.C.*, 201 Ill. App. 3d at 798.

It is apparent from the record that, in the nine months following J.A.'s adjudication as a neglected minor, Rosado made reasonable progress toward unification with J.A. under the circumstances. Rosado complied with both the court's directives and the DCFS service plans. Rosado visited J.A. on a weekly basis, as the court ordered, and he usually visited more often than that. Rosado took a drug test, the results of which were negative. Rosado also submitted himself to a psychological evaluation and a substance abuse assessment. Furthermore, he testified that he underwent anger management counseling as a follow-up to his psychological evaluation. The trial court determined that Rosado's testimony was credible and this court must give great deference to the trial court's determination. Thus, we find that the trial court's finding that Rosado made reasonable progress toward unification with J.A. under the circumstances was not against the manifest weight of the evidence.

We now turn to whether Rosado made a reasonable effort to correct the conditions that were the basis for the removal of J.A. Reasonable effort is a subjective standard, focusing on the amount of effort that is reasonable for the particular parent whose rights are at stake. *In re C.M.*, 305 Ill. App. 3d at 164. In contrast to the goal of reasonable progress, reasonable efforts relate to the much narrower goal of correcting the conditions that were the basis for the removal of the child from the parent. *In re C.M.*, 305 Ill. App. 3d at 164. Parental deficiencies collateral to the conditions that were the basis for the child's removal, even if serious enough to prevent the return of the child, are outside the scope of this inquiry and are therefore not relevant. *In re C.M.*, 305 Ill. App. 3d at 164.

According to the original petition for adjudication of wardship, J.A. was removed from the custody of her biological mother because J.A. was left at home alone without a proper care plan and because J.A. was a drug-exposed infant. During the nine months following J.A.'s adjudication as a neglected minor, Rosado submitted himself to a substance abuse evaluation, in which it was found that he exhibited no signs of substance dependence. In addition, Rosado took a drug

test, which yielded a negative result. Rosado also remained in contact with Ordonez and allowed Ordonez to inspect his home in hopes that he would be awarded custody of J.A. During this time period, Rosado also continued to visit J.A. and to provide financial support for her. Thus, we find that it was not against the manifest weight of the evidence for the trial court to hold that Rosado made reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent.

■ Finally, the State argues on appeal that the findings of the trial court were based on a number of errors. First, the State argues that the trial court's findings as to fitness were improperly based on testimony concerning J.A.'s best interests. Second, the State alleges that the trial court rejected the State's witnesses without due consideration. Third, the State says that the trial court did not limit its deliberations to the evidence presented. Fourth, and finally, the State argues that the trial was not conducted before an unbiased, open-minded trier of fact. We disagree with the State's arguments and affirm the findings of the trial court.

In a bench trial, the trial judge is presumed to have relied only on competent and admissible evidence. *In re J.R.Y.*, 157 Ill. App. 3d 396, 400, 510 N.E.2d 541 (1987). It is a well-established rule that, when the trial judge is the trier of fact, every presumption will be accorded that she considered only admissible evidence and disregarded inadmissible evidence in reaching her conclusion. *People v. Clarke*, 50 Ill. 2d 104, 108, 277 N.E.2d 866 (1971). This presumption may only be rebutted by a clear showing to the contrary. *In re Prough*, 61 Ill. App. 3d 227, 232, 376 N.E.2d 1078 (1978). A review of the record in light of these authorities demonstrates that no error occurred in this case.

Based on the foregoing, we find that the holding of the trial court that Rosado was not an unfit parent was not against the manifest weight of the evidence.

Affirmed.

GREIMAN and THEIS, JJ., concur.